# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>_____</td><td>:</td><td></td></tr>
<tr><td>UNITED STATES OF AMERICA</td><td>:</td><td>Honorable Andrew L. Carter, Jr., USDJ</td></tr>
<tr><td></td><td>:</td><td>Criminal No.0208 1:20CR660-11 (ALC)</td></tr>
<tr><td>v.</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>GAZMEND LITA</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Defendant</td><td>:</td><td></td></tr>
<tr><td>_____</td><td>:</td><td></td></tr>
</table>

_____

## SENTENCING MEMORANDUM ON BEHALF OF
## GAZMEND LITA
_____

WHIPPLE AZZARELLO, LLC
161 Madison Avenue, Suite 325
Morristown, NJ 07960
(973) 267-7300
Attorneys for Defendant Gazmend Lita

On the Memorandum:
John A. Azzarello
William J. Munoz

## PRELIMINARY STATEMENT

Defendant Gazmend Lita humbly stands before the Court for sentencing, having pleaded guilty on September 8, 2021, to one count of Conspiracy to Transmit Wagering Information contrary to 18 U.S.C. § 371, 18 U.S.C. § 1084.

Mr. Lita accepts full responsibility and is extremely remorseful for his actions in this case. He recognizes that he violated the law and, although he understands he must be sentenced for his actions, he hopes that the Court will view his crimes in the context of his lifetime of service to his community, his otherwise spotless criminal record, and his relatively minor role in the conspiracy to which he pled guilty. On Mr. Lita's behalf, we file this Sentencing Memorandum setting forth the factors the Court must consider in exercising its discretion to impose a fair, reasonable, and just sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

## STATEMENT OF THE CASE

As Mr. Lita set forth in his allocution before this Court, in or about March 2017, Mr. Lita was approached by his friend Ismail Djokic, who asked Mr. Lita to help him open the Albanian American Social Club in Cliffside Park, New Jersey. Mr. Djokic was not a United States citizen and lacked a record of good credit, making him unable to obtain a commercial lease. Mr. Djokic stated that he would run the club if Mr. Lita was willing to sign the commercial lease for the property. Mr. Lita – who like Mr. Djokic is of Albanian descent – agreed.

In or about May 2017, Mr. Lita signed a commercial lease and, along with Mr. Djokic, opened the Albanian American Social Club ("the Social Club") located at 34 Palisade Avenue in Cliffside Park, New Jersey. The Social Club charged a membership fee of $300 per year and

served as a place where Albanian Americans could relax and socialize.  In addition to food and drink, the Social Club offered parties, games, and other social activities.

When the Social Club first opened in May 2017, Mr. Djokic introduced Mr. Lita to Ervin Makishti, who went by the name Vinny.  Mr. Lita was told that Vinny would provide at least one laptop to the Social Club which the Social Club members could use to place bets on sporting events such as soccer games.  At the end of each month, club members would either owe money or be entitled to receive money based on the success of their total wagers for the month.  Vinny was responsible for collecting the money from the members who owed and was responsible for paying money to members who had won their wagers.  If Vinny collected more money from losing wagers than he paid in winnings, Mr. Lita would receive approximately ten percent of the profit.  Mr. Lita believes that the remaining 90% of profits were shared by Vinny and Mr. Djokic.  If there was no profit for the month, Mr. Lita received nothing, but was still responsible for covering the operating costs including food, drink, utilities, cable, internet, and lease payments.

## SENTENCING PROCEDURE

After *United States v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory.  Now, a sentencing court must consider the Guideline ranges and then "tailor the sentence in light of other statutory concerns," most importantly 18 U.S.C. § 3553(a).  *Id*. at 245.  Post *Booker*, a district court must engage in a three-step sentencing procedure: (1) determine the applicable Sentencing Guidelines range, (2) consider whether a departure from the Guidelines range is appropriate, and (3) consider the Guidelines range along with the factors listed at 18 U.S.C. § 3553(a).  *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).   The Court "may not presume that the Guidelines range is reasonable.  [It] must make an individualized

assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007)(citations omitted); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009).

## **LEGAL ARGUMENT**

### I.      **Guidelines Calculation**

Pursuant to the plea agreement, Mr. Lita and the Government agree that his total Guidelines offense level is 10 and his Criminal History Category is I, resulting in a recommended Guideline range of 6 to 12 months' imprisonment.[1]

However, as this Court well knows, the Supreme Court has ruled that the United States Sentencing Guidelines now simply play an advisory role in the overall process of arriving at a sentence that is "sufficient, but not greater than necessary" to meet the purposes of a just sentence; nothing more, nothing less.  18 U.S.C. § 3553(a).  The Guidelines carry no presumptive value or weight.  Neither may they be presumed reasonable.  The Supreme Court made this latter point clearly in *Nelson v. United States*, 129 S. Ct. 890 (2009), where the Court summarily reversed a Fourth Circuit decision that had upheld the application of a presumption of reasonableness to the Guidelines.  In reversing, the Supreme Court stated "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."  *Id.* at 892 (emphasis in original).  Thus, the Guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

---

[1] Although the parties have agreed not to seek any adjustments or departures pursuant to the Guidelines, the parties have retained the right to request a variance pursuant to 18 U.S.C. §3553(a).

## II.      A Sentence of Probation is Warranted Under The §3553(a) Factors

Pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), in determining whether a sentence is "sufficient, but not greater than necessary," to achieve the objectives of sentencing, this Court must consider:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the kinds of sentence available;

- the kinds of sentences and the sentencing range established by the Guidelines for the applicable category of offense committed by the applicable category of defendant;

- any pertinent policy statement issued by the Sentencing Commission;

- the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

- the need to provide restitution to any victims of the offense.

[18 U.S.C. § 3553(a)(1), (3)-(7).]

Under 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a [district] court may . . . receive and consider for the purpose of imposing an appropriate sentence."

The Supreme Court has noted that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Indeed, the Court has explicitly rejected a rule requiring "extraordinary circumstances" to justify a sentence outside the Guidelines range. *Id.* at 47. For the reasons set forth below, Mr. Lita respectfully asserts that a downward variance resulting in a noncustodial sentence would be appropriate in his case.

**a.   §3553(a)(1): The Nature and Characteristics of the Offense and The History and Characteristics of the Offender**

Mr. Lita acknowledges that he made a foolish decision in permitting gambling at the Albanian American Social Club, and profiting from that gambling.  He is ashamed of his choices and understands that he must be punished.  He requests that this Court impose a sentence that will fulfill the purposes of sentencing and allow him to continue an otherwise law-abiding life marked by full-time work and dedication to his family and his community.

*i.   The Offense Conduct*

This was neither a drug crime, a violent crime, nor a property crime.  Rather, it was a victimless crime.  Mr. Lita understands that his actions in this case ran contrary to the laws of the United States, but he would also submit that permitting and profiting from gambling at the Albanian American Social Club was a single foolish decision and not indicative of a pattern of illegal behavior.  The idea to permit gambling at the Social Club was not Mr. Lita's, nor did he take a lead role in the gambling operation.  Mr. Lita assisted Mr. Djokic in opening the Social Club with the understanding that it would simply be a place where the local Albanian American community could come together for food, drinks, and camaraderie.  He was only approached regarding gambling after the Social Club was already up and running.  Consistent with his quite passive role in the gambling operation, he was only given 10 percent of the operation's profits, an in many months, was given no money at all.  Mr. Lita realizes he should have rejected Mr. Djokic's proposition and he does not seek to excuse his behavior but hopes to give the Court some context as to his relatively minor role in the conspiracy.

### ii.  The Good in Mr. Lita's Life Mitigates and Outweighs the Bad

"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant."  *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14  (S.D.N.Y. 2006 ) (imposing 42-month sentence in securities fraud case, where Guidelines call for life sentence in part because of the defendant's past integrity and good deeds).  Mr. Lita hopes that the Court will consider the tremendous good in his life when determining an appropriate sentence in this case.

As the attached character letters illustrate, Mr. Lita has a reputation as an upright, generous, community-minded man who, until the instant offense, had lived 51 years without running afoul of the law.

Mr. Lita was born in 1970 and spent the first 19 years of his life in Albania – at the time, a communist nation.  At age 19, he fled to Yugoslavia with four cousins to escape political persecution due to his family's known connections to the anti-communist movement in Albania. After spending over a month in jail in the former Yugoslavia for illegally crossing the border, Mr. Lita and his cousins were released while their asylum applications were pending in the United States.  After a five-month wait, during which he worked labor and construction jobs to make ends meet, Mr. Lita's application was granted.

From the moment of his arrival in this country in January 1991, Mr. Lita sought to become "American."  He relied on extended family in the New York City area to help him understand life

in the United States, which differed greatly from that in communist Albania.  Mr. Lita knew his difficulties with the English language would hinder his ability to make a life for himself in the United States, so he immediately enrolled in an English as a Second Language course upon arriving.

Mr. Lita's life here has been marked by constant and uninterrupted hard work and dedication to his community.  Shortly after arriving here, Mr. Lita took a job washing dishes at a restaurant, where he worked his way up to full-time cook despite lacking any formal culinary training.  Here, Mr. Lita saw that the restaurant industry offered a path to financial independence and – just as importantly – he saw opportunities to use food as a way to bring people together and support his community.  Over the years, Mr. Lita went from washing dishes, to serving as a head chef, to owning numerous restaurants and employing dozens of people.

After settling in the United States, Mr. Lita returned to Albania to marry his wife Shpresa. She returned to the United States with him, and they have been happily married for 23 years. Although the instant case has understandably taxed their relationship, Shpresa remains supportive of Mr. Lita and intends to support him as he works to make amends for the errors that led to his conviction.  The couple have three children, one seven-year-old and two college students, aged 20 and 22.  Since they were born, Mr. Lita has dedicated himself to ensuring that his children have the opportunity, security, and comfort that he lacked as a child in Albania.  This dedication has at times required sacrifice.  Mr. Lita worked long hours during the early days of his restaurant ownership, often arriving home after his family had gone to bed and leaving again before they awoke.  After years of hard work establishing the restaurant, Mr. Lita was finally able to spend more time raising his children – a role he cherishes as the most important in his life.  As Shpresa Lita states, Mr. Lita "is a hard working man who sacrificed his time with his family to ensure our

well being in this country. . . . Our children got whatever they asked for and more from us[,] only made possible by Gazmend." (Letter of Shpresa Lita, attached hereto as Exhibit A).

Throughout his life – from dishwasher to restauranteur – Mr. Lita has always been proud to be a part of his community and to give back to that community whenever possible.  In his letter to the Court on Mr. Lita's behalf, Michael McPartland, mayor of Edgewater, New Jersey, describes some of the many instances where Mr. Lita selflessly supported his community.  As Mayor McPartland explains, Mr. Lita "deeply cares about how people are doing whether it be his family, friends or strangers." (Letter of Michael McPartland, attached hereto as Exhibit B). Mr. Lita is especially dedicated to supporting his community's first responders; whenever a police officer, firefighter, or EMT ordered food from his restaurant, Mr. Lita would never accept payment.  In 2015, Mr. Lita went above and beyond to support these same first responders.  That year, a devastating fire struck an apartment complex nearby, displacing hundreds of people and demanding the efforts of an untold number of first responders.  Mr. Lita called Mayor McPartland and asked if there was any way Mr. Lita could help.  The mayor told Mr. Lita that the best way he could help the rescue effort was by doing for the first responders what he had spent years doing for the community: feed them. Within 45 minutes, Mr. Lita was on the scene with dozens of trays of food.  After discovering that this would not be enough food to satisfy the need, Mr. Lita kept his kitchen open late into the night to feed the first responders and those displaced from their homes.

The Albanian American Social Club was intended to be another location that would bring a community together – in this instance, Albanian Americans in the New York/New Jersey area. Although gambling occurred at the Social Club, this was ancillary to what Mr. Lita viewed as the Social Club's core purpose: to serve as a space for the local Albanian American community to

come together and share food, drink, and their life experiences.  Despite Mr. Lita's regrettable decision to permit and profit from gambling at the establishment he leased, it largely achieved those original laudable objectives, providing a place for Albanian Americans to share a coffee, have a meal, and celebrate their unique heritage.

In addition to Mr. Lita's desire to help his local community, he also cares deeply about the wellbeing of Albanians worldwide.  Former Congressman Joseph DioGuardi, president of the Albanian American Civic League, worked closely with Mr. Lita when Mr. Lita was a member of the Civic League's board.  The Civic League is a nonprofit volunteer organization representing the concerns of more than one million Albanian Americans, their families, and their communities in Southeast Europe.  Mr. Lita has also volunteered time and money toward the Albanian American Foundation and the Albanian American Public Affairs Committee, hosting many meetings at his restaurant at his own expense.  (See Letter of Joseph DioGuardi, attached hereto as Exhibit C).

### iii.  *Mr. Lita's Positive Employment History and Prospects*

The Court may consider Mr. Lita's employment history and future prospects in imposing a sentence that is sufficient but not greater than necessary to promote the statutory goals of sentencing.  *See United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)(en banc) (district court did not abuse its discretion in sentencing defendant to probation with a year of home detention where Guidelines range was 12 to 18 months, in part because of defendant's negligible criminal history, employment record, community ties, and extensive charitable works); *see also United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (where Guidelines recommended 30 to 37 months, sentence of one day in jail and supervised release for three years not unreasonable in part because of defendant's "history of strong employment"). As set forth above, Mr. Lita has been consistently employed for decades, often employing dozens of others at his restaurants.  Unfortunately, Mr.

Lita had no choice but to resign from his most recent position as a halal food inspector due to his involvement in this case.  The position required a great deal of travel to various halal facilities and the conditions of his pretrial release made such travel impossible. Mr. Lita is hopeful that he can resume working as a halal inspector if he is sentenced to probation and the conditions of probation permit him to travel for work.

iv.      *Mr. Lita's Lack of Criminal History*

The Court may consider Mr. Lita's lack of criminal history when determining whether to impose a below-Guideline sentence.  *See e.g. United States v. Paul*, 561 F.3d 970 (9th Cir. 2009) (where Guidelines recommended 10-16 months, court's within-Guideline sentence of 15 months unreasonably high in part because defendant was a first-time offender with no criminal record whatsoever);   *Tomko*, 562 F.3d 558 (where Guidelines recommended 12-18 months, sentence of probation on condition of one year home detention and fine of $150,000 not unreasonable in part because of defendant's "minimal criminal record"); 28 U.S.C. § 994(j) (stressing "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").  Mr. Lita respectfully asserts that his lack of criminal history, as well as the non-violent nature of the instant offense, supports the imposition of a below-Guideline sentence of probation.

In addition to considering Mr. Lita's lack of criminal history, this Court should also consider the length of time until Mr. Lita committed his first and only offense.  *See e.g. United States v. Smith* (4th Cir. April 23, 2008), 2008 WL 1816564 (unpub.) (whereGuidelines recommended 78-97 months, sentence of 24 months not abuse of discretion where defendant was 64 years old with no criminal history); *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wisc. 2008) (where Guidelines recommended 210-262 months, sentence of 72 months appropriate in

10

part because defendant was 49 years old with "no prior record whatsoever" and "he had never before been to jail for even one day"). Mr. Lita is 51 years old and has been in the United States since 1991. For the three decades Mr. Lita has been in this country, he has been a productive member of his community and has never run afoul of the law. Mr. Lita respectfully requests that the Court consider not only his lack of criminal history but also the duration of his law-abiding behavior to this point.

> ### v. *Mr. Litas' Age and Personal Characteristics Makes Him Unlikely to Reoffend*

The Court may consider Mr. Litas' age when fashioning a sentence. *See United States v. Payton*, 754 F.3d 375 (6th Cir. 2014) (where defendant convicted of bank robbery, with long history of robberies, and Guidelines called for 210 to 262 months, court's sentence of twice that amount was unreasonable because court did not consider that recidivism greatly decreases with age). "The Sentencing Commission has observed that '[r]ecidivism rates decline relatively consistently as age increases.'" *Id.* at 378-79.

Numerous statistics show Mr. Lita presents very little likelihood of reoffending. First, at the time of sentencing, Mr. Lita will be 51 years old. The recidivism rate is 16.1% for offenders between the ages of 51 and 60 in Criminal History Category I. Kim Steven Hunt & Billy Easley II, *The Effects of Aging on Recidivism Among Federal Offenders*, 24, United States Sentencing Comm'n (December 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/ research-publications/2017/20171207_Recidivism-Age.pdf. Moreover, Mr. Lita is significantly less likely to reoffend than his peers within that cohort. Offenders in Criminal History Category I who, like Mr. Lita, have zero criminal history points are approximately 35% less likely to be rearrested than Category I offenders with one criminal history point. Mr. Lita's age,

combined with other factors including his history of law-abiding behavior makes him extremely unlikely to offend again.

**b.  §3553(a)(2): The Need for the Sentence Imposed to Promote the Purposes of Sentencing: Punishment, Deterrence, Incapacitation, and Rehabilitation**

The Court is faced with fashioning a sentence "sufficient, but not greater than necessary," to promote the statutory objectives set forth in § 3553(a)(2): (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The first two (2) purposes of sentencing are punishment and deterrence.  There is no question that society has an interest in discouraging illegal gambling and the ills often associated with it.  Mr. Lita understands that even if he did not believe his actions were causing any harm, they did violate the law and he must be punished.

Mr. Lita has been on pretrial supervision for over a year since voluntarily surrendering on January 6, 2021.  For practical purposes, this period of pretrial supervision has been akin to serving a sentence of probation, under which Mr. Lita has been required to comply with the strict conditions of pretrial release.  Mr. Lita's relationships with his family, friends, and community have also been strained by this case.  His once unimpeached reputation in the community has been tarnished and his relationship with his wife has been tested as never before.  Although he is yet to be sentenced, Mr. Lita's punishment began the day he surrendered to face the charges against him.

General deterrence is at best an ethereal concept that assumes both perfect information and rational decision-making on the part of every actor.  *See* Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment*, The Sentencing Project, November

2010, available at https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.  However, in order for severe sentences to deter a potential offender, that person must both 1) be aware of the possible sentence for his actions and 2) apply logic to determine whether his action is worth the potential risk.  Furthermore, because most crimes do not result in arrest and conviction, the overall deterrent effect of punishment is substantially reduced.  "Clearly, enhancing the severity of punishment will have little impact on people who do not believe they will be apprehended for their actions."  *Id.* at 2.  Numerous studies have borne out the theory that the severity of punishment is far less of a deterrent than the certainty of punishment.  *See generally, id.* (discussing research over several decades and in various nations concluding that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment).

Likewise, the concept of specific deterrence through lengthy sentences is ill-supported by available research.  In fact, a 1999 meta-analysis of 50 studies over four decades found that the opposite was true: longer prison sentences (over 30 months) resulted in a 29% recidivism rate, compared to a 26% rate among prisoners serving an average of 12.9 months.  *Id.* at 6 (citing Paul Gendreau, T. Little, *A Meta-Analysis of Adult Offender Recidivism: What Works!,* Criminology, 34(3):575-607, 1996).  Highly relevant to Mr. Lita's case, a review of the available evidence implies that increasingly lengthy prison terms are counter-productive, a burden on budgets, and fail to enhance public safety.  Mr. Lita's specific characteristics - including his long history of employment, his strong community ties, and his long history of law-abiding behavior - also reduce any need for specific deterrence.

The third (3) purpose of sentencing, incapacitation of the offender and protection of the public must also be analyzed.  Certainly, as long as an inmate is incarcerated, it is virtually

impossible for him to commit crimes against the general public. However, as discussed above, lengthy prison sentences increase the likelihood of recidivism and Mr. Lita's age and personal characteristics makes re-offending highly unlikely.

Furthermore, Mr. Lita is not a danger to the public, nor must he be incapacitated. Although Mr. Lita acknowledges that his actions were illegal, the crime to which he pled guilty was non-violent and he would note that there is no identifiable victim in this case. Accordingly, his crimes do not indicate that he would be a danger to the public. Any incapacitation that the Court deems necessary could certainly be satisfied with a term of probation. Indeed, Mr. Lita has been on pretrial supervision for over a year, during which time he has been fully compliant with his conditions of release. Notably, the Government was confident enough in Mr. Lita's compliance with his conditions of release that he was permitted to travel internationally for business purposes. Perhaps most importantly, Mr. Lita is truly remorseful for his actions. He knows how foolish he was to become involved in the charged conspiracy, and he regrets his choices immensely. He wishes to right his wrongs and return to a law-abiding life with his family. Mr. Lita wishes he could pay the entire forfeiture amount immediately, but having lost his job approximately one year ago, he is unable to do so. However, by the date of sentencing, Mr. Lita will make a substantial good-faith payment of $10,000. If Mr. Lita is sentenced to probation and is able to regain his job as a halal inspector, he hopes to be able to pay his forfeiture in short order.

### c. 3553(a)(3), (4):  The Kinds of Sentences Available, and the Sentencing Range Established by the Guidelines

This Court is free to impose any sentence below the statutory maximum that it deems sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a). In short, the Court has full discretion just as district judges did prior to the enactment of the Sentencing Guidelines. As the

14

United States Probation Office notes, a non-custodial sentence would be appropriate in Mr. Lita's case, and Mr. Lita respectfully requests the Court impose a probationary sentence as recommended by that office.

## **<u>CONCLUSION</u>**

For the foregoing reasons, we respectfully request that the Court strongly consider Mr. Lita's personal characteristics and the nature of the offense, and impose a sentence of probation, which would be sufficient but not greater than necessary to promote the statutory goals of sentencing.

Respectfully submitted,

**WHIPPLE AZZARELLO, LLC**

By:  <u>/s/ John A. Azzarello</u>
John A. Azzarello

JAA
Enclosures
cc:     Samuel Raymond, Esq., Assistant United States Attorney (via e-mail)
          David R. Felton, Esq., Assistant United States Attorney (via e-mail)
          Ashley E Geiser, United States Probation Officer (via e-mail)
          Gazmend Lita (via e-mail)

# EXHIBIT A

Dear Judge Carter,

My name is Shpresa Lita and I am writing this letter also on behalf of my children. Writing a letter like this is difficult as I am writing about my husband of 23 years and now have to think about and discuss the experience we have had till now. That however would not be able to be addressed in one letter as there are many experiences people go through when married for that long. Instead I will keep it brief.

My husband emigrated to the United States 10 years before he and I got married. He came back to Albania after he had set himself up here to marry me and brought me over in time for our first born to be born here as an American. This was a good as well as a difficult time as I spent the majority of my time with our newborn and he was constantly at work. We owned a restaurant in Edgewater, NJ and spent the whole day there and would always come well into the night finding us asleep most of the time. There were many cases where he would come late and leave early in the morning and I would not see him at all. Although I would have liked to see him I knew that he was making this sacrifice for me and our children. Once he got the restaurant running he began to spend more time with us which made things better for me and his children since they got the chance to also be raised by their father.

My husband is a hard working man who sacrificed his time with his family to ensure our well being in this country. Because of this me and my children had the opportunity to travel back to our home country to visit our family over there. Our children got whatever they asked for and more from us only made possible by Gazmend.

This recent experience however has tested our marriage like no other. We have known each other for a long time and kept nothing from each other. This did come as a surprise and has caused conflict within our household. Our children have also grown up and understand to a degree how things work. At the same time I have not seen my husband in a state like this as he knows perfectly well what he got himself into. I have accepted what he has done and in this situation we as a family support him as he works

to earn back his good name. I believe in these types of situations the only way a person can persevere is with the support of their family. It is my hope that this episode can be put behind us so that we can assume some level of normalcy. It has been a strain in our marriage however we have put it behind us as that is the only thing we can do. He is a good man, caring father and loving husband and I hope his judgement takes that into account.

Respectfully,

Shpresa Lita and family

# EXHIBIT B



## BOROUGH OF EDGEWATER

*Office of the Mayor*

55 RIVER ROAD
EDGEWATER, NJ 07020

*Michael J. McPartland*
*Mayor*

Telephone (201) 943-1700  ~  Facsimile (201) 943-9242
Email: mayormcpartland@edgewaternj.org

Dear Judge Carter,

My name is Michael McPartland and I am the Mayor of Edgewater, New Jersey.  I have been living in Edgewater my whole life and have gotten to know many people prior to being mayor and also during my term of office.  I have known Gazmend "Gus" Lita for about 25 years and I can say with full confidence that we are more than just friends.  Gazmend has owned pizza parlors and restaurants in Edgewater for about that time and anybody who has lived here for some time knows Gus.  I met Gus when he had his pizzeria on River Road here in Edgewater and at that time he was the talk of the town.  I remember the first time I went in and saw Gus working furiously to keep up with his orders.  I also recall the first slice I had and it was by far one of the best I ever had.  Since that day, I along with all the people I knew, would go there for lunch.  Over time, I befriended Gus, even going to his restaurant, Le Jardin, also in Edgewater.  As the current mayor of Edgewater I can confidently say that Gazmend is an "Edgewater Guy." My children grew up on his food as have many others.

I became aware of Gazmend's guilty plea in about April 2021 from a mutual friend of mine and Gazmend's.  At first there were feelings of disbelief.  I could not understand what had happened. I contacted Gazmend to offer help on my part, and he explained the nature of the offense.  I expressed that his role seemed minor, but Gus insisted he was responsible for his actions told me he would own up to them.  I know he plans to do everything he can to right this wrong including cooperating with the authorities.  Gus's involvement in a criminal enterprise shocked me because it is totally out of character for this man I have known for 25 years.  However, his willingness to own his mistakes and try to make amends is entirely in keeping with his character.

To speak of Gus's character would take more than a couple of pages.  He is what I would call a "people" person.  He deeply cares about how people are doing whether it be his family, friends, or strangers.  I would always see him calling people inquiring about their day or other matters. When he owned his pizzeria called Brothers on River Road, any time a person from the town, whether it be a police officer, firefighter, EMT, etc., Gus would never take a penny from them. Before I was Mayor of Edgewater when Gus had his pizzeria, I would feel bad he would not take

my money saying, "*how can I take Lieutenant Mike's sons' money.*" This made me feel like he valued who I was and the respect he showed my father as well made me respect him even more. Aside from his everyday charity to the town, what really sealed our friendship was when the Avalon Apartment Complex fire took place in 2015. It had been a few weeks since I was sworn into office when I was notified of the inferno taking place in my town. It was a devastating affair where the whole apartment complex burned down and hundreds of people were displaced. As the town was in crisis mode, I received a call from Gus asking me how he could help. I had all my people dealing with the fire for countless hours and I figured they would need to eat. I told Gus I need food for my people on the ground. Within 45 minutes he had dozens of trays of food at a nearby location, a safe distance from the fire. He told me to let him know if I needed more and in all honesty I did. He kept his restaurant open late into the night making food so that the town didn't go hungry. There were many people who suffered that day but from tough times emerges the persistence and heroism of people. Gus was a person you can rely on and is still a person I can turn to in a time of need. It is difficult to find people who will go the extra mile if asked and will ask for nothing in return.

It pains me to see Gazmend facing criminal penalties for violating the laws of a country he loves and has done so much for. I know it pains Gus as well. He is a family man and a hardworking individual. Every person in their life has made mistakes but it really takes a man to make a mistake and then accept it and own up to it. He regrets his mistakes, and I can see that this experience has changed him. From our conversations I can tell he has reevaluated his position in life and wishes to focus on maintaining his important relationships with his community and his family. I know the only thing Gus wants is to return to a normal life caring for his family and community. I respectfully ask your honor to impose a sentence that would allow Gus to do so as quickly as possible. His family and community need him.

Respectfully,

Michael J. McPartland
Mayor

# EXHIBIT C



**JOSEPH J. DIOGUARDI**
**MEMBER OF CONGRESS**
**1985 - 1989**

TRUTH IN GOVERNMENT
TEL: (914) 671-8583
www.truthingovernment.org

ALBANIAN AMERICAN CIVIC LEAGUE
TEL: (914) 762-5530
www.aacl.com

October 13, 2021

Honorable Andrew L. Carter
United States District Judge
United States District Court
Southern District of New York
500 Pearl St.
New York, NY 10007

**Re: Gazmend Lita**

Dear Hon. Andrew Carter,

I am writing on behalf of Gazmend Lita in my capacity as a former member of the U.S. House of Representatives, representing Westchester County, New York, from 1985 to 1989, and as the President of the Albanian American Civic League, which I founded in 1989.

The Civic League is a nonprofit organization that represents the concerns of more than one million Albanian Americans for their families and communities in Southeast Europe. My work for the Civic League, and that of my wife, Shirley Cloyes DioGuardi, the Balkan Affairs Adviser, is done on a volunteer basis. We earn our income in other capacities.

As advocates for the human rights and the self-determination of oppressed peoples, Shirley and I have made more than thirty trips since the late 1990s to Albania, Kosova, and contiguous parts of the Balkans where Albanians also reside: the Presheva Valley in southern Serbia, Macedonia, and Montenegro.

Shirley and I have known Gazmend Lita for the past twenty years, during which he has served as a member of the Board of Directors of the Albanian American Civic League. The Civic League is a 501(c)(4) organization, and we report our activities to the US House and Senate.

We also direct two other organizations: the Albanian American Foundation, which focuses primarily on the unique role that Albanians played in saving every Jew who either lived in Albania or sought asylum there during World War II, and the Albanian American Public Affairs Committee, which contributes to Members of the House and Senate who focus on resolving the

conflict between Serbia and Kosova and bringing equal human and civil rights to Albanians in Macedonia, Montenegro, southern Serbia, and northern Greece.

Gazménd Lita has given his time and financial support to all three organizations, and, when he was the chef and co-owner of Le Jardin (a restaurant in Edgewater, New Jersey, overlooking the Hudson River) for eighteen years, he hosted each year at his expense many meetings of the Albanian American Civic League and Foundation Board of Directors.

I know Gazmend to be a hardworking, responsible individual and a loving husband and father of three children. I have been informed about his guilty plea, and I can confirm that his wrongdoing is inconsistent with the Gazmend Lita that my wife and I know. For this reason, I hope that the Court will be lenient and merciful, especially because he is the sole provider for his wife, Shpresa, and his three children. ███ age 7 is in elementary school and███, age 22, and ███, age 20, are both in college, and Gazmend is paying for their expensive education.

I deeply appreciate this opportunity to speak about a person that my wife and I have known for two decades and who has done so much for his family, for the Albanian American Civic League and Foundation, and for his impoverished homeland in the Balkans.

If you have any questions about Gazmend Lita, please feel free to contact me on my cell phone at ███████

Sincerely,

Joseph J. DioGuardi